AO 106 (Rev 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
Middle District of Florida

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) | Case No.  3:21-mj-1442-JBT |
| The premises located at 10158 Bradley Road, Jacksonville, FL 32246, as more fully described in Attachment A | ) ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

the premises located at 10158 Bradley Road, Jacksonville, FL 32246, as further described in Attachment A.

located in the _____ Middle _____ District of _____ Florida _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2251(a) | Production of child pornography |
| 18 U.S.C. § 2252(a)(2) | Distribution of child pornography |
| 18 U.S.C. § 2252(a)(4)(B) | Possession of child pornography |

The application is based on these facts:

See Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Daniel Moxley, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  9/16/21

_____
*Judge's signature*

City and state:  Jacksonville, Florida

Joel B. Toomey, United States Magistrate Judge
*Printed name and title*

Exhibit A

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Daniel Moxley, being duly sworn, hereby state as follows:

1.      I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and have been so employed since July 2017.   I am currently assigned to the Jacksonville, Florida Division of the FBI, where I conduct a variety of investigations, including those involving the sexual exploitation of children.   Prior to this assignment, I was employed as an Intelligence Analyst and Management and Program Analyst for the FBI for approximately 7 years.   I have Bachelor's Degrees in Economics and Political Science.   I have received law enforcement training from the FBI Academy at Quantico, Virginia.   A substantial portion of my duties are dedicated to investigating cases involving crimes against children under the auspices of the FBI's "Innocent Images" National Initiative.   Since becoming a Special Agent, I have worked with experienced Special Agents who also investigate child exploitation offenses.   In the performance of my duties, I have investigated and assisted in the investigation of matters involving the solicitation for, possession, collection, distribution, production, receipt, and transportation of depictions of child pornography.   I have been involved in searches of residences pertaining to the possession, distribution, collection, production, and/or transportation of child pornography through the execution of search warrants.

2.      I have investigated and assisted in the investigation of criminal matters involving the sexual exploitation of children that constituted violations of 18 U.S.C. §§ 2251, 2252, 2252A, and 2422.   As a federal agent, I am authorized to investigate

and assist in the prosecution of violations of laws of the United States, and to execute search warrants and arrest warrants issued by federal and state courts.

3.    The statements contained in this affidavit are based on information I obtained from my own personal observations, my personal knowledge, training, and experience, and from information directly provided to me by other law enforcement officers and personnel.   This affidavit is being submitted for the limited purpose of establishing probable cause and securing a search warrant, and I have not included each and every fact known to me concerning this investigation.   I have set forth only the facts that I believe are necessary to establish probable cause to believe that contraband, fruits, instrumentalities, other items illegally possessed and evidence of violations of Title 18, United States Code, Sections 2251, 2252 and/or 2252A, are and will be present in the location to be searched.

4.    I am requesting authority to search the premises specifically identified in Attachment A, which includes the physical residence, as well as any computer and computer media and electronic storage devices located therein, and the yards and concrete driveway leading from Bradley Road up to the residence, and any vehicles located on the driveway or in the yards.   I also request to seize any and all items listed in Attachment B as instrumentalities, fruits, and/or evidence of criminal activity specified herein.

2

## STATUTORY AUTHORITY

5.      This investigation concerns alleged violations of Title 18, United States Code, Sections 2251, 2252 and 2252A, relating to material involving the sexual exploitation of minors.   Based upon my training and experience, as well as conversations with other experienced law enforcement officers, computer forensic examiners, and federal prosecutors, I know the following:

a.      18 U.S.C. §§ 2251(a) and (e), in pertinent part, make it a federal crime or offense for any person to employ, use, persuade, induce, entice, or coerce, or attempt to employ, use, persuade, induce, entice, or coerce an individual whom the person believed to be a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of the conduct, if such persons knows or has reason to know that such visual depiction would be transported or transmitted using any means or facility of interstate or foreign commerce.

b.      18 U.S.C.  § 2252(a) in pertinent part prohibits a person from knowingly transporting, shipping, receiving, distributing, reproducing for distribution, possessing or accessing with intent to view any visual depiction of minors engaging in sexually explicit conduct using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, including by computer or mails.

c.      18 U.S.C.  § 2252A(a) in pertinent part prohibits a person from knowingly transporting, shipping, receiving, distributing, reproducing for distribution, possessing, or accessing with intent to view any child pornography, as

3

defined in 18 U.S.C. § 2256(8), using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, including by computer.

      d.    18 U.S.C. § 2252(a)(1) prohibits a person from knowingly transporting or shipping using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, including by computer or mails, any visual depiction of minors engaging in sexually explicit conduct. Under 18 U.S.C. § 2252(a)(2), it is a federal crime for any person to knowingly receive or distribute, by any means including by computer, any visual depiction of minors engaging in sexually explicit conduct using any means or facility of interstate or foreign commerce or that has been mailed or shipped or transported in or affecting interstate or foreign commerce.   That section also makes it a federal crime for any person to knowingly reproduce any visual depiction of minors engaging in sexually explicit conduct for distribution using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or through the mails. Under 18 U.S.C. § 2252(a)(4), it is also a crime for a person to knowingly possess or knowingly access with intent to view, one or more books, magazines, periodicals, films, or other materials which contain visual depictions of minors engaged in sexually explicit conduct that have been mailed, or have been shipped or transported using any means or facility of interstate or foreign commerce or in and affecting interstate or foreign commerce, or which were produced using materials which have been mailed or so shipped or transported, by any means including by computer.

      e.    18 U.S.C. § 2252A(a)(1) prohibits a person from knowingly

4

mailing, transporting, or shipping using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, any child pornography.   18 U.S.C.  § 2252A(a)(2) prohibits a person from knowingly receiving or distributing any child pornography that has been mailed or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer.   18 U.S.C. § 2252A(a)(3) prohibits a person from knowingly reproducing child pornography for distribution through the mails or in or affecting interstate or foreign commerce by any means, including by computer.   18 U.S.C. § 2252A(a)(5)(B) prohibits a person from knowingly possessing or knowingly accessing with intent to view any book, magazine, periodical, film, videotape, computer disk, or other material that contains an image of child pornography that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer.

## DEFINITIONS

6.     The following definitions apply to this Affidavit:

a.     "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, illegal or that do not necessarily depict minors in sexually explicit

5

poses or positions.

b.  "Child pornography," as used herein, includes the definitions in 18 U.S.C. §§ 2256(8) and 2256(9) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct).  See 18 U.S.C. §§ 2252 and 2256(2).

c.  "Visual depictions" include undeveloped film and videotape, data stored on computer disk or by electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in permanent format.  See 18 U.S.C. § 2256(5).

d.  "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic area of any person.  See 18 U.S.C. § 2256(2).

e.  "Computer," as used herein, is defined pursuant to 18 U.S.C. § 1030(e)(1), as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic or storage functions, and

6

includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

      f.    "Computer hardware," as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

      g.    "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

      h.    The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, paintings), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form

7

(including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), personal digital assistants (PDAs), multimedia cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

      i.     "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data.   Data security devices may consist of hardware, software, or other programming code.   A password (a string of alpha numeric characters) usually operates a sort of digital key to "unlock" particular data security devices.   Data security hardware may include encryption devices, chips, and circuit boards.   Digitally coded data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.   Data security software or code may also encrypt, compress, hide, or "boobytrap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

      j.     "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet and is associated with a physical address.   IP addresses can be dynamic, meaning that the Internet Service Provider

(ISP) may assign a unique and different number to a computer at different times that it accesses the Internet. IP addresses might also be static, if an ISP assigns a user's computer a particular IP address which is used each time the computer accesses the Internet.

        k.    "Wireless telephone" (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device. Many wireless telephones are minicomputers or "smart phones" with immense storage capacity and connectivity capability.

        l.    A "digital camera" is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of

9

fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

   m. A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

<strong><u>COMPUTERS AND CHILD PORNOGRAPHY</u></strong>

   7. Based upon my training and experience, as well as conversations with other experienced law enforcement officers and computer forensic examiners, I know that computers and computer technology have revolutionized the way in which individuals interested in child pornography interact with each other. In the past, child pornography was produced using cameras and film (either still photography or movies). The photographs required darkroom facilities and significant skill to

10

develop and reproduce the images.   There were definable costs involved with the production of pornographic images, and to distribute these images on any scale required significant resources and significant risks.   The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public and/or law enforcement.   The distribution of these wares was accomplished through a combination of personal contacts, mailings and telephone calls.

8.      The development of computers has radically changed the way that child pornographers manufacture, obtain, distribute and store their contraband. Computers basically serve five functions in connection with child pornography: access, production, communication, distribution, and storage.

9.      Child pornographers can now convert paper photographs taken with a traditional camera (using ordinary film) into a computer readable format with a device known as a scanner.  Moreover, with the advent, proliferation and widespread use of digital cameras, images and videos can now be transferred directly from a digital camera onto a computer using a connection known as a USB cable or other device.  Digital cameras, as well as "smart" phones such as the Apple iPhone, have the capacity to store images and videos indefinitely, and memory storage cards used in these cameras are capable of holding hundreds of images and videos.   A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection.   Electronic contact can be made to literally millions of computers around the world.

10.     The computer's ability to store images in digital form makes the

11

computer itself an ideal repository for child pornography.   The size of the electronic storage media, that is, the hard disk drive used in home computers has grown tremendously within the last several years.   These hard disk drives can store hundreds of thousands of images at very high resolution.

11.     The World Wide Web of the Internet affords collectors of child pornography several different venues for obtaining, viewing and trading child pornography in a relatively secure and anonymous fashion.

12.     Collectors and distributors of child pornography frequently use online resources to retrieve and store child pornography, including services offered by Internet portals such as Yahoo!, Hotmail, and Google, among others.   The online services allow a user to set up an account with a remote computing service that provides email services as well as electronic storage of computer files in any variety of formats.   A user can set up an online storage account from any computer with access to the Internet.   Evidence of such online storage of child pornography is often found on the user's computer.   Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer in most cases.

13.     As is the case with most digital technology, communication by way of computer can be saved or stored on the computer used for these purposes.   Storing this information can be intentional, i.e., by saving an email as a file on the computer or saving particular website locations in, for example, "bookmarked" files.   Digital information, images and videos can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places

(e.g., temporary files or ISP client software, among others). Often, a computer will automatically save transcripts or logs of electronic communications between its user and other users that have occurred over the Internet. These logs are commonly referred to as "chat logs." Some programs allow computer users to trade images while simultaneously engaging in electronic communications with each other. This is often referred to as "chatting," or "instant messaging." Based upon my training and experience, as well as conversations with other law enforcement officers and computer forensic examiners, I know that these electronic "chat logs" often have great evidentiary value in child pornography investigations, as they can record communication in transcript form, often show the date and time of such communication, and also may show the dates and times when images of child pornography were traded over the Internet. In addition to electronic communications, a computer user's internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. A forensic examiner often can recover evidence suggesting whether a computer contains peer-to-peer software, when the computer was sharing files, and some of the files which were uploaded or downloaded. Such information is often maintained on a computer for long periods of time until overwritten by other data.

## SEARCH AND SEIZURE OF COMPUTER SYSTEMS

14.     Based upon my training and experience, as well as conversations with other experienced law enforcement officers, I know that searches and seizures of evidence from computers commonly require agents to download or copy information

13

from the computers and their components, or seize most or all computer items

(computer hardware, computer software, and computer related documentation) to be

processed later by a qualified computer expert in a laboratory or other controlled

environment.   This is almost always true because of the following:

        a.     Computer storage devices (e.g., hard drives, compact disks

("CDs"), diskettes, tapes, and others) can store the equivalent of thousands of pages

of information.   Especially when the user wants to conceal criminal evidence, he or

she often stores it in random order with deceptive file names.   This requires

searching authorities to examine all the stored data to determine whether it is

included in the warrant.   This sorting process can take days or weeks, depending on

the volume of data stored, and it would be generally impossible to accomplish this

kind of data search on site; and

        b.     Searching computer systems for criminal evidence is a highly

technical process requiring expert skill and a properly controlled environment.   The

vast array of computer hardware and software available requires even computer

experts to specialize in some systems and applications, so it is difficult to know

before a search which expert should analyze the system and its data.   The search of a

computer system, which includes the use of data search protocols, is an exacting

scientific procedure which is designed to protect the integrity of the evidence and to

recover hidden, erased, compressed, password protected, or encrypted files.   Since

computer evidence is extremely vulnerable to tampering or destruction (which may

be caused by malicious code or normal activities of an operating system), the

controlled environment of a laboratory is essential to its complete and accurate analysis. Based on my training and experience, as well as conversations with other law enforcement officers and computer forensic examiners, I know that computer forensic techniques can often recover files, including images and videos of child pornography, that have long been "deleted" from computer media by a computer user.

## CHILD PORNOGRAPHY COLLECTOR CHARACTERISTICS

15.    Based on my experience, training, and conversations with other experienced agents who investigate cases involving the sexual exploitation of children, I know that certain common characteristics are often present in individuals who collect child pornography.   I have observed and/or learned about the reliability of these commonalities and conclusions involving individuals who collect, produce and trade images of child pornography.   Based upon my training and experience, and conversations with other experienced agents who investigate cases involving the sexual exploitation of children, I know that the following traits and characteristics are often present in individuals who collect child pornography:

a.    Many individuals who traffic in and trade images of child pornography also collect child pornography.   Many individuals who collect child pornography have a sexual attraction to children.   They receive sexual gratification and satisfaction from sexual fantasies fueled by sexually explicit depictions of children.

b.    Many individuals who collect child pornography also collect

15

other sexually explicit materials, which may consist of photographs, magazines, motion pictures, video tapes, books, slides, computer graphics or digital or other images for their own sexual gratification.   Many of these individuals also collect child erotica, which may consist of images or text that do not meet the legal definition of child pornography but which nonetheless fuel their deviant sexual fantasies involving children.

      c.     Many individuals who collect child pornography often seek out like-minded individuals, either in person or on the Internet, to share information and trade depictions of child pornography and child erotica as a means of gaining status, trust, acceptance, and support.  This contact also helps these individuals to rationalize and validate their deviant sexual interest in children and associated behavior.  The different Internet based vehicles used by such individuals to communicate with each other include, but are not limited to, Peer-to-Peer (P2P), email, email groups, social media applications (apps), bulletin boards, Internet Relay Chat Rooms (IRC), newsgroups, instant messaging, and other similar vehicles.

      d.     Some individuals who collect child pornography maintain books, magazines, newspapers and other writings (which may be written by the collector), in hard copy or digital medium, on the subject of sexual activities with children as a way of understanding their own feelings toward children, justifying those feelings and finding comfort for their illicit behavior and desires.  Such individuals often do not destroy these materials because of the psychological support that they provide.

      e.     Some individuals who collect child pornography often collect,

16

read, copy or maintain names, addresses (including email addresses), phone numbers, or lists of persons who have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests. These contacts are maintained as a means of personal referral, exchange, or commercial profit. These names may be maintained in the original medium from which they were derived, in telephone books or notebooks, on computer storage devices, or merely on scraps of paper.

      f.     Many individuals who collect child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect them from discovery, theft, or damage. These individuals view their sexually explicit materials as prized and valuable materials, even as commodities to be traded with other like-minded individuals over the Internet. As such, they may maintain or "hoard" their visual depictions of child pornography for long periods of time in the privacy and security of their homes or other secure locations. These individuals may protect their illicit materials by passwords, encryption, and other security measures; save it on movable media such as CDs, DVDs, flash memory, thumb drives, and removable hard drives, which can be very small in size, including as small as a postage stamp, and easily secreted; or send it to third party image storage sites via the Internet. Based on my training and experience, as well as my conversations with other experienced law enforcement officers who conduct child exploitation investigations, I know that individuals who possess, receive, and/or distribute child pornography by computer devices using the Internet often maintain

17

and/or possess the items listed in Attachment B.

16.     As stated in substance above and based upon my training and experience, as well as my conversations with other experienced law enforcement officers, I know that individuals who collect and trade child pornography often do not willfully dispose of their child pornography collections, even after contact with law enforcement officials.

17.     Based on my training and experience, I also know that, with the development of faster Internet download speed and the growth of file-sharing networks and other platforms through which individuals may trade child pornography, some individuals also have been found to download, view, and then delete child pornography on their computers or digital devices on a cyclical and repetitive basis.  However, as referenced above, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices using forensic tools.  Furthermore, even in instances in which an individual engages in a cycle of downloading, viewing, and deleting images, a selection of favorite images involving a particular child or act is often maintained on the device.

18.     Based on my training and experience, I know that within the last several years, individuals who have a sexual interest in minor children have used the internet and internet-enabled devices with increasing frequency to make contact with and attempt to establish relationships with potential child victims.  These individuals may perceive that the internet provides some degree of anonymity and safety from

prosecution.  Because more and more children are using the internet and internet enabled devices, these individuals potentially expose more and more child victims to online sexual exploitation.  These individuals may contact potential child victims through social networking websites or applications ("apps") such as Facebook, Twitter, and Kik, or may engage in online conversations with children through text messaging and email.  During these online conversations, photographic images and links to internet websites can be easily exchanged between the individual and the targeted child.  Based on my training and experience, I know that when such an individual uses text messaging, email, or other websites to have online contact with children, the Internet-enabled device used, whether it is a computer, a cellular telephone, a "smart" phone such as an "iPhone," or a tablet such as an "iPad," often saves and maintains evidence of such contacts.  This evidence can often be extracted and examined by a trained forensic examiner.

## FACTS ESTABLISHING PROBABLE CAUSE

19.     I make this affidavit in support of a search warrant for the premises located at 10158 Bradley Road, Jacksonville, FL, 32246, which is currently occupied by SCOTT MATTHEW YOTKA (date of birth ██████ 1974) and other individuals. SA Leigh Jackson have personally observed the premises and the residence thereon, and described its appearance and shown pictures of it to me, and it appears as set forth in Attachment A.  This affidavit is based on information provided to me both verbally and in written documentation from other FBI agents and other law enforcement officers and personnel, as well as through investigation that I personally

19

conducted as set forth herein.

20.    The FBI is investigating SCOTT MATTHEW YOTKA, who resides at the premises located at 10158 Bradley Road, Jacksonville, FL, 32246, as a potential suspect for using one or more computers, smart phones, and computer media at this residence to commit violations of Title 18, United States Code, Sections 2251, 2252 and 2252A, which prohibit the production, distribution, and possession of child pornography, that is, visual depictions of minors engaging in sexually explicit conduct as defined in Title 18, United States Code, Section 2256.

21.    On September 16, 2021, I reviewed an investigative lead from the FBI Washington Division that had been sent to the FBI Jacksonville Division for further investigation.  This investigative lead consisted of documents and other materials, and during my review of these materials, I learned, among other things, the following:

   a. On September 15, 2021, Detective Thomas Sullivan, an FBI Task Force Officer assigned to the FBI Washington Field Office, began a proactive undercover investigation using a particular social media application (the "app") in an effort to identify individuals attempting to sexually exploit children using the internet.  Based on my training and experience, I know that this particular app is often used by individual users to meet online, engage in conversation through private messages, and share photographs and other content.  I also know that the use of this app necessarily involves the use of the internet, which I know to be a facility

20

of interstate commerce. Based on my training and experience, I also know that this particular social media application is often used by individuals who have a sexual interest in minor children as a platform to identify other like-minded individuals to trade, distribute, receive and possess child pornography.

b. While acting in an undercover capacity, Detective Sullivan (the "UC") joined a public chat room on the app, the title of which appeared indicative of one that would attract users engaged in the trading of child pornography and sexual exploitation of children.

c. After joining the chat room, the UC sent a message to the public room that read "What's up, any perv parents in here want to chat with a taboo dad". An app user with a display name "Scott Yotka" and username of "Scottnjax44" then posted a message in the public chat room that read "All you new people that came in and have not verified, please do so with me now."

d. The UC reviewed the members of the group and observed that app user "Scottnjax44" was an administrator of the group.

e. At approximately 7:11 PM Eastern Standard Time, app user "Scottnjax44" messaged the UC using the private message feature of the application and a conversation ensued. The conversation that occurred between the UC and "Scottnjax44" was as follows:

      Scottnjax44: Hi

21

Scottnjax44: You active with anyone

UC:      what up Scott, I keep busy. You a parent too?

Scottnjax44: Yes I am

UC:      Nice I have a son, 9 years old. 35-va

UC:      You?

Scottnjax44: 6g 4b 1b 47 fl

UC:      Nice, great ages. Played with my boy during all of them

UC:      Which one are you active with?

Scottnjax44: The boys

Scottnjax44: Girl won't play

UC:      Why? She's doesn't like daddy?

Scottnjax44: Step dad and no

UC:      Ah got you

UC:      Wish I had a step daughter

UC:      But my boy works just fine

Scottnjax44: Cool

Scottnjax44: What you do with him

UC:  Well, little bit of everything. Love rubbing his little boy pussy with my cock and cumming all over his ass

UC:      What about you?

Scottnjax44: Same little of everything but no anal yet

22

UC:        They're probably too young for that

Scottnjax44: Yes that are

UC:   I didn't start that until recently with mine but I still don't go all the way in, afraid I'll hurt him

Scottnjax44: Right

Scottnjax44: Lots of lube

UC:   Mmmmm yes

UC:   How often do you see yours?

Scottnjax44: Every day

Scottnjax44: You

UC:   I wish, divorced. We have schedule when I have him

Scottnjax44: Ahhh

UC:   Oh don't worry, I have him quite a bit

Scottnjax44: That's good

Scottnjax44: Does he enjoy it

UC:   He's grown to a bit. Most of the time he's playing video games while I play with him, but he's starting to moan a bit and enjoy it

UC:   What about yours

Scottnjax44: They squirm lol

Scottnjax44: and have that look like let's just get this over with

UC:   Mmmm that only encourages me

Scottnjax44: Yeah

UC:   That's hot

Scottnjax44  He suck and swallow or no

UC:   He sucks but doesn't swallow

Scottnjax44: Nice

UC:   Tried once, def got a reaction from him that was funny for me

UC:   He was a tad bit surprises s

UC:   Surprised*

UC:   Does yours?

Scottnjax44: Suck yes swallow no

UC:   Nice

Scottnjax44: It is

Scottnjax44: Little one starting to bite so got to be careful with him

UC:   That would be a bad surprise lol

Scottnjax44: It was last time

UC:   No way. He leave a mark???

Scotnjaxx44:Luckily no but hurt like hell

Scotnjax44:  He bit the tip

UC:   The perils of being a perv

Scottnjax44: Lol right

24

UC:    So whatcha trying to do?

Scottnjax44: Eventually everything

Scotnjax44:  Love to fuck their little holes and piss inside them and get them to swallow

UC:    Mmmmmm turn them into your little play toys

Scottnjax44: Exactly

Scottnjax44: Wanted that with the girl as well but like I said, she won't play nicely

UC:    That happens I guess

UC:    Your wife know?

Scottnjax44: Nope

Scottnjax44: Have to go around her

Scottnjax44: What does he like the most

UC:    He's surprisingly really into making out.

UC:    Which I think means he's going to be down for really embracing what we do soon

Scottnjax44: He likes kissing

UC:    Yah.

Scottnjax44: Tongue

UC:    Yah

UC:    He's into it, taught him how

Scottnjax44: Sweet

Scottnjax44: That's awesome

Scottnjax44: You did good

UC:   I try to train him properly, hoping he's embraces it when puberty hits

Scottnjax44: Yes

Scottnjax44: You ever share him or not yet

UC:   Not yet, got close with one guy but it didn't happen

UC:   I would love to though

UC:   I try to train him properly, hoping he's embraces it when puberty hits

Scottnjax44: Yes

Scottnjax44: You ever share him or not yet

UC:        Not yet, got close with one guy but it didn't happen

UC:        I would love to though

Scottnjax44: That's good

Scottnjax44: Swap boys ??

UC:        You want to try an older one

UC:        I mean as long as yours doesn't bite me

Scottnjax44: Lok

Scottnjax44: No I meant would you swap boys with another dad

UC:        Yah I would

UC:        Would love to watch someone play with mine too

26

Scottnjax44: Ok

Scottnjax44: Cool

UC:         You?

Scottnjax44: Hell yeah, would love to watch someone play with your son too lol

Scottnjax44: So how far deep do you go? Tip? Half way?

UC:         Just the tip, mostly rub now

Scottnjax44: Cool

Scottnjax44: Just enough to open him up

UC:         Just get my tip in there a little and start working him open

Scottnjax44: Good dad

UC:         That's my job

Scottnjax44: Yes it is

UC:         So how do I know you're a good dad too

Scottnjax44: [Image sent of nude infant laying on top of a diaper and a gray comforter with his penis exposed to the camera (image #1)]

Scottnjax44: [Image sent of a nude minor laying on a grey comforter exposing his penis to the camera.  Black pillows are in the background of the image (image #2)]

Scottnjax44: [Image sent of a minor with an adult penis in his

27

mouth (image #3)]

Scottnjax44: [Image sent of a child's buttocks with a translucent fluid on the child's buttocks (image #4)]

Scottnjax44: [Video sent of an adult male ejaculating on a child's buttocks (video #1)]

UC:          Mmmmm so fucking hot

UC:          Can you take a live pic of that comforter?

UC:          Now I'm so excited to get my son tomorrow

Scottnjax44: Not right now I'm at work

UC:          Ok, love what you're doing with them

Scottnjax44: Thanks

UC:          Btw I'm in VA. Maybe we're close

Scottnjax44: I'm in Florida

UC:          Not too far

Scottnjax44: [Image sent of a Sharpie pen penetrating an infant's buttocks (image #5)]

Scottnjax44: [Image sent of a Sharpie pen penetrating an infant's buttocks (image #6)]

UC:          [Image sent of an adult male]

Scottnjax44: [Image sent of an adult's fingers spreading the buttocks of an infant and exposing the anus of the infant to the camera (image #7)

28

Scottnjax44: [Image sent close up photograph of the scrotum, penis, and anus of a child while the child is laying on a gray comforter (image #8)]

UC:        So you know I'm real

Scottnjax44: Ok

UC:        Mmmm look at his little cock and boy pussy

UC:        Love that

UC:        You do anything cool for work? You're there late which is lame

Scottnjax44: Emergency dispatcher

UC:        Oh you're a hero

Scottnjax44: I just send people where they need to go

UC:        Humble too!

Scottnjax44: It's just a job

UC:        Yep!  Cool job though, bet you hear some weird shit

Scottnjax44: All the time

UC:   When do you get home? Sorry I'm so excited to actually talk to a real dad, so may fakes on here

Scottnjax44: Tomorrow morning

Scottnjax44: We do 12 hour shifts

UC:   That's a long shift

Scottnjax44: Worse when we have stay over and we here for 16

29

hours

UC:   Damn man I ain't about that life

Scottnjax44: Not for everyone

UC:   Def not, especially me who sits in an office all day

Scottnjax44: Lol right

Scottnjax44: I used to do that

UC:   Yah it's lame. I wish I worked outside

UC:   Oh well, pays the bills, and pays for all the shit I get my kids so he keeps his mouth shut

Scottnjax44: Lol exactly

UC:   How do you keep yours quiet?

Scottnjax44: They young and don't talk lol

UC:   True, wish they stayed that age

UC:   Much less expensive

Scottnjax44: Lol tell me about it

UC:   Oh well his ass is mine

Scottnjax44: Lol

Scottnjax44: Yes it is

Scottnjax44: Enjoy it

UC:   Always. Gotta dip, talk to you in the morning

Scottnjax44: Ok have good night

UC:   Morning, what's up

30

f. On September 16, 2021, the FBI served an emergency disclosure request on the company that owns the app seeking subscriber information for the app user "Scottnjax44". On the same day, the FBI reviewed the documents responsive to this emergency disclosure request. The responsive documents listed the name of the user as "Scott Yotka", the e-mail address as "syotka74@gmail.com". The results listed a frequent IP login activity from IP addresses 161.243.255.34 and 71.135.22.145. The responsive documents listed login activity from IP address 71.135.22.145 on various times on September 11, 13, 14, and 16, 2021, among other dates. The device type was listed as an "Android." The model type listed was a "KB2007".

g. On September 16, 2021, the AT&T Global Legal Demand Center verbally responded to an emergency disclosure request requesting subscriber and service address information for IP address 71.135.22.145 at 08/29/2021 10:50:42 UTC and 9/16/2021 11:01:54 UTC. AT&T advised that the subscriber is Scott Yotka, with service address 10158 Bradley Road, Jacksonville, FL.

22. On September 16, 2021, I reviewed the images and video sent by app user "Scottnjax44" to the UC as set forth above. Some of the images and the video I observed are described as follows:

> IMAGE #2: Color image of a fully nude prepubescent male, based on the child's facial features and complete absence of pubic

31

hair, laying on what appears to be a bed with gray-colored bedding and black pillows. The child is laying flat on his back and his legs are spread, fully exposing his penis, making it the focal point of the image. Based on my training and experience, I have probable cause to believe that this image depicts a minor engaged in sexually explicit conduct, and therefore constitutes child pornography pursuant to 18 U.S.C. § 2256.

IMAGE #3: Color image of a prepubescent male, based on the child's facial features, with an adult male's penis in his mouth. The camera is zoomed in on the child's mouth, making the adult male's penis in the child's mouth the focal point of the image. Based on my training and experience, I have probable cause to believe that this image depicts a minor engaged in sexually explicit conduct, and therefore constitutes child pornography pursuant to 18 U.S.C. § 2256.

VIDEO #1: A color video with sound, approximately six seconds in length, of the buttocks of a minor, based on the size of the child's buttocks in comparison to the adult's penis in the image. The adult male is masturbating his penis and ejaculates onto the buttocks of the child. The camera is zoomed in, making it the focal point of the video clip. Based on my training and experience, I have probable cause to believe that this video

32

depicts a minor engaged in sexually explicit conduct, and therefore constitutes child pornography pursuant to 18 U.S.C. § 2256.

IMAGE #6:  A color image of a prepubescent male, based on the size of the child's genitalia, with his buttocks and scrotum facing the camera, making it the focal point of the image.  An adult is inserting into a Sharpie pen into the child's buttocks.  Based on my training and experience, I have probable cause to believe that this image depicts a minor engaged in sexually explicit conduct, and therefore constitutes child pornography pursuant to 18 U.S.C. § 2256.

IMAGE #7:  A color image of an infant child, based on the size and appearance of the child, with her buttocks and anus fully exposed to the camera.  The camera is zoomed in on the infant's anus an adult male is spreading the infant's buttocks, fully exposing the infant's anus, making it the focal point of the image. Based on my training and experience, I have probable cause to believe that this image depicts a minor engaged in sexually explicit conduct, and therefore constitutes child pornography pursuant to 18 U.S.C. § 2256.

IMAGE #8:  A color image of a prepubescent minor male, based on the child's complete absence of pubic hair and size of their

33

genitalia, with his penis, scrotum, and anus fully exposed,

making it the focal point of the image.  An unknown individual's

fingers are holding the child's scrotum, fully exposing his anus.

Based on my training and experience, I have probable cause to

believe that this image depicts a minor engaged in sexually

explicit conduct, and therefore constitutes child pornography

pursuant to 18 U.S.C. § 2256.

23.     On September 16, 2021, I reviewed the Florida Department of Motor

Vehicles record for SCOTT MATTHEW YOTKA, which listed his physical address

as 10158 Bradley Road, Jacksonville, FL 32246, his date of birth as 05/20/1974, and

registered vehicle as a 2021 Kia sport utility vehicle, bearing Florida license plate

GDTJ07.

24.     On September 16, 2021, I reviewed the app profile for user

"Scottnjax44" and observed a photo of an adult male.  I compared the profile image

of user "Scottnjax44" to the photo of YOTKA on the Florida Department of Motor

Vehicles website.  Based on my review, I have probable cause to believe that the

image of the user profile for app user "Scottnjax44" and the photo of YOTKA on the

Florida Department of Motor Vehicles website, depict the same person, that is,

SCOTT MATTHEW YOTKA.

25.     I have reviewed the Facebook page of user "Scott M. Yotka" and

observed that it contains several photos of minor children, some of which are

pictured together with YOTKA.  The adult male pictured on this account's cover

34

page appears to be the same individual as the individual pictured on the user profile for app user "Scottnjax44" and the photo of YOTKA on the Florida Department of Motor Vehicles website.

26.     On September 16, 2021, FBI Special Agent Leigh Jackson conducted physical surveillance at the premises located at 10158 Bradley Road, Jacksonville, FL 32246 and has advised me of her observations.  SA Jackson observed a silver KIA sport utility vehicle with Florida license plate GDTJ07 parked in the grass next to the driveway of the residence.  The mailbox on the property has the number "10158" displayed on both sides.

27.     Based on information obtained during this investigation, I know that the particular residence referred to in Attachment A, that is, the current residence of SCOTT MATTHEW YOTKA, is located on the premises located at 10158 Bradley Road, Jacksonville, FL 32246.

## CONCLUSION

28.     Based on the foregoing, I have probable cause to believe that one or more individuals has used and is using one or more computers and/or electronic storage media located at the premises located at 10158 Bradley Road, Jacksonville, Florida 32246, more fully described in Attachment A to this affidavit, to, among other things, produce, distribute, and possess child pornography. Therefore, I have probable cause to believe that one or more individuals, using the Subject Premises described herein has violated 18 U.S.C. §§ 2251, 2252 and/or 2252A. Additionally, I have probable cause to believe that fruits, evidence, and instrumentalities of

violations of 18 U.S.C. §§ 2251, 2252 and/or 2252A, including at least one computer device, smart phone, and/or other electronic storage media containing images and/or videos depicting child pornography, and the items more fully described in Attachment B to this affidavit (which is incorporated by reference herein), will be located at this premises.

DANIEL MOXLEY, Special Agent
Federal Bureau of Investigation

Sworn and subscribed before me this ___16___ day of September, 2021.

JOEL B. TOOMEY
United States Magistrate Judge

36